# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| TRACEY A. NECAK, | CASE NO. 1:17 CV 1473 |
| Plaintiff, | |
| v. | JUDGE DONALD C. NUGENT |
| SELECT PORTFOLIO SERVICING, INC., | **MEMORANDUM OPINION** |
| Defendant. | |

This matter is before the Court on the Motion for Summary Judgment filed by Defendant, Select Portfolio Servicing, Inc. (Docket #53) and the Motion for Partial Summary Judgment filed by Plaintiff, Tracey A. Necak (Docket #54).

**I.     Factual and Procedural Background.[1]**

On March 31, 2006, Tracey A. Strzala, n/k/a Tracey A. Necak, entered into a $178,000 mortgage loan for the purchase of a home at 97 Weathervane Lane, Brunswick, Ohio. The monthly payment on the loan was $1,381.30. (Docket #54 at Exhibit B.) Soon after obtaining

---

[1] The facts as stated in this Memorandum Opinion and Order are taken from the Parties' submissions. Those material facts that are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving Party.

the mortgage loan, Tracey married her husband, Josh Necak, and changed her name to Tracey A. Necak. (Docket #54 at Exhibit C, Paragraph 4.) The Necaks own a small commercial moving business.

In 2013, SPS acquired servicing rights to the mortgage loan. In 2015, the Necaks' family income began to decline due to a slow-down in the moving industry and, at that same time, Mrs. Necak's monthly mortgage payment rose to nearly $1,700 due to interest rate increases. (Docket #54, Exhibit D.) SPS repeatedly offered Mrs. Necak programs for mortgage assistance in 2015, which she initially turned down due to her husband's distrust of big banks and her faith that her family could make ends meet. (Docket #54 at Exhibit C, Paragraph 8, and Exhibit G.) SPS asserts that Mrs. Necak was consistently behind on her mortgage payments. (Docket #53 at p. 3.)

On or about February 10, 2016, SPS sent Mrs. Necak a "Streamline HAMP Trial Offer," stating that SPS made a loss mitigation program decision to offer her a Streamline Home Affordable Trial Modification Plan. (Docket #54 at Exhibits F and G.) The Offer stated that her mortgage loan would be permanently modified if she made three timely trial payments of $1,155.78 and "submitted all the required documents." The letter reads, "This is the first step toward qualifying for more affordable mortgage payments. Please read this letter so that you understand all the steps you need to take to modify your mortgage payments." The letter continues, "After all trial payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified." Further, SPS explained, "Once you make all of your trial period payments on time, we will send you a streamline HAMP affidavit and a modification agreement detailing the terms of the modified mortgage. You will be

required to sign and return to us both the streamline HAMP affidavit and two copies of the modification agreement by the date specified in the letter accompanying such documents." (Id.) Mrs. Necak called SPS to accept the offer. (Docket #54 at Exhibit C.)

Mrs. Necak made three timely trial payments of $1,155.78 in March, April and May of 2016 by phone. (Docket #54, Exhibit G.) After making her third payment in May, SPS sent Mrs. Necak a letter dated May 14, 2016, including a permanent Loan Modification Agreement and the Streamline HAMP Affidavit. (The letter was mailed on May 16, 2016.) Two copies of the Loan Modification Agreement and Streamline HAMP Affidavit were to be signed, notarized and returned to SPS by May 28, 2016. (Docket #54, Exhibit H.) The Loan Modification Agreement was drafted in the name of Tracey A. Strzala. SPS argues that Mrs. Necak, "knew, or reasonably should have known, that agreement would be prepared for the signature of 'Tracey Strzala,'" since that was the name to whom the offer was addressed. (Docket #53 at p. 5.)

Mrs. Necak took the Modification Agreement to two different area banks in an attempt to get her signature notarized. (Docket #54, Exhibits C and G.) To prove her identity, Mrs. Necak presented her driver's license, social security card, and bank card to the notaries. Each notary refused to notarize her signature on the Modification Agreement because the name Strzala appeared on the document, and they refused to alter the document to remove Strzala and add Necak. (Docket #54 at p. 4.)

Mrs. Necak contacted SPS by phone on May 27, 2016, the day before the documents were due, regarding her inability to get the documents notarized. (Id.) SPS informed Mrs. Necak that in order to complete the Modification Agreement, she was required to prove her name change by providing SPS with a copy of her marriage certificate. (Id. at p. 5.) Mrs. Necak

-3-

requested clarification and was transferred to another SPS employee. Mrs. Necak states the SPS employee she was transferred to confirmed that the marriage certificate Mrs. Necak had at home would be sufficient. (Id.) The employee told Mrs. Necak to email the document to SPS so that the Modification Agreement could be updated with her married name. (Id.)

On May 27, 2016, Mrs. Necak emailed the proof of her name change to the email address SPS provided. (Id.) After the May 27, 2016 call, Mrs. Necak tried once again to get her signature notarized at a third bank – taking the marriage document and an old library card showing her maiden name to a third bank – but was unsuccessful. (Id. at p. 5, Footnote 5.)

On May 31, 2016, SPS sent Mrs. Necak a letter informing her that she would need to provide SPS with a marriage certificate, a court approved document showing her name change, or a divorce certificate. The letter did not say anything about the name change request having any impact or bearing upon the pending loan modification. (Docket #53 at p. 6.) On June 1, 2016, Mrs. Necak called SPS to make another monthly payment of $1,155.78 and asked for an update on the review of her proof of name change. (Docket #54 at p. 5.) SPS represented that it would have to follow up with her as to the status of her name change and the updated Modification Agreement. On June 8, 2016, SPS sent Mrs. Necak a letter, stating as follows:

> As of the date of the letter [,] we have not yet received back your signed HAMP modification agreement. It is a requirement of HAMP that a signed modification agreement is received. If we do not receive your signed modification agreement by 6/20/2016 we will consider this as your non-acceptance of the HAMP modification and will close out your request for HAMP. This means your loan terms will revert back to the terms prior to the HAMP Modification. IT IS IMPERATIVE THAT YOU RETURN THE SIGNED MODIFICATION DOCUMENTS IMMEDIATELY. Failure to return the signed agreement by the date specified will result in your loss of your HAMP affordable payment, eligibility for annual HAMP incentives and could result in your account being referred for future legal action.

On June 13, 2016, Mrs. Necak called SPS again to inquire regarding the status of her updated Modification Agreement. (Docket #54 at p. 6.) At that time, SPS informed her that it was unable to open the document she had emailed seventeen days prior. (Id.) Mrs. Necak agreed to re-send proof of her name change and asked SPS to contact her to confirm receipt. (Id.) Mrs. Necak re-emailed the marriage certificate immediately upon ending the June 13, 2016 call. (Id.) On June 16, 2016, an SPS employee contacted Mrs. Necak on her cell phone and confirmed that the document emailed on June 13, 2016 was sufficient to prove her name change and informed her that SPS was in the process of updating and mailing her Modification Agreement. (Id.)

Mrs. Necak did not receive an updated Modification Agreement, nor did she receive written notice that the documentation she sent was incomplete or inadequate. On July 1, 2016, Mrs. Necak called SPS to make another monthly payment of $1,155.78 and requested an update on the revised Modification Agreement. SPS did not provide an update on the name change to Mrs. Necak, but SPS's communication log was updated to indicate, "M1 needs to be notified that what she sent in did not meet the verification requirements for the name change and we still need a valid marriage license to update her name accordingly." (Docket #54 at Exhibit G.) Although an SPS representative had previously indicated the document was sufficient, SPS asserts that "the version of the marriage certificate Mrs. Necak sent SPS was partially obliterated because portions of the embroidery were removed as a result of sticking to an envelope." (Docket #53 at p. 8.)

On July 5, 2016, Mrs. Necak called SPS again to ask for an update. (Docket #7.) On

-5-

that call, Mrs. Necak was told that she would need to send a valid marriage license to receive an updated Modification Agreement.[2] Mrs. Necak tried to explain that she had already received confirmation that what she sent was sufficient and that she had already been told SPS would mail her an updated Modification Agreement. Mrs. Necak told SPS she would be out of town but would go to the courthouse to obtain a copy of her marriage license as soon as she returned, if that was acceptable. (Docket #54 at p. 7.) Mrs. Necak states that SPS told her that the Modification Agreement would not expire and that she "would be ok" as long as she sent the marriage license to SPS "as soon as possible." (Id.)

On July 20, 2016, Mrs. Necak returned to Ohio and called SPS. SPS informed Mrs. Necak that she owed $6,772.86 on her account immediately; that her mortgage loan was in default; and, that she had until August 14, 2016 to cure the default or risk legal action. (Id. at p. 8.) The SPS representative asked Mrs. Necak if she had ever sent anything in to prove her name change and informed Mrs. Necak that their records did not even show an open "workout" plan. SPS told Mrs. Necak she was too late to accept the Modification Agreement because they had not received a valid marriage certificate and cited two separate dates on which the offer had expired. (Id.) Mrs. Necak was told that she would be required to start the process over and provide full documentation to modify her loan and that the representative she had previously spoken to on July 5, 2016 had no way of knowing the date that the Modification Agreement would expire and should not have told Mrs. Necak that she "would be ok" or that the

---

[2] SPS asserts that "the version of the marriage certificate she sent to SPS was partially obliterated because portions of the embroidery were removed as a result of sticking to an envelope." (Docket #53 at p. 8.) It is not clear whether this was communicated to Mrs. Necak prior to this lawsuit being filed.

Modification Agreement would not expire if she sent SPS a marriage license soon. (Id.)

On August 5, 2016, SPS sent Mrs. Necak a notice informing her that she was denied a HAMP modification because she had not returned the signed Modification Agreement and stated that Mrs. Necak had 30 days from August 5, 2016 to appeal the decision. (Id.) On August 8, 2016, Mrs. Necak mailed $2,000 to SPS. Mrs. Necak then made monthly payments in September, October, and November 2016. (Id. at p. 9.) Mrs. Necak did not file an appeal. SPS filed a foreclosure action on February 9, 2017. (Id.) On May 11, 2017, SPS notified Mrs. Necak that it was unilaterally and without explanation updating the name on her account to reflect her married name. (Id.)[3]

**II.    The Complaint.**

On July 13, 2017, Mrs. Necak filed her Complaint in this Court against SPS. On September 13, 2017, Mrs. Necak filed her Amended Complaint. (Docket #6.)

---

3

The Medina County Court of Common Pleas dismissed the State Court Foreclosure Action with prejudice, finding it would be inequitable under the facts and circumstances to permit foreclosure, stating, "SPS never clearly communicated a consistent deadline to prove her name change. Initially, the deadline was May 28, 2016. Exhibit E. On June 1, 2016, Mrs. Strzala was advised an updated agreement was being sent. Exhibit B. By letter dated June 8, 2016, SPS notified Mrs. Strzala the documents must be received by June 30, 2016. Exhibit 10. There was no evidence or testimony as to how this particular deadline was determined to be a reasonable amount of time." *U.S. Bank, N.A. v. Tracey A. Strzala, et al.*, Medina County Court of Common Pleas, Case No 17CV0133, April 10, 2019. The Common Pleas Court Judge adopted the findings of the Magistrate Judge, who had previously found, "[Mrs. Necak] was never given any indication that there was some firm deadline to provide the modification documents by any of the representatives she regularly spoke with. In fact, the evidence supports the conclusion that none of the service representatives Ms. Strzala spoke to at SPS had any knowledge of a firm deadline."

In Count I of her Amended Complaint, Mrs. Necak alleges SPS violated the Real Estate Settlement Procedures Act, ("RESPA"), Regulation X, 12 C.F.R. § 1024.40(b)(1); 12 C.F.R. § 1024.40(b)(2); 12 C.F.R. § 1024.41(b)(2)(i)(B); 12 C.F.R. § 1024.41(c)(2)(iv); 12 C.F.R. § 1024.41(d)(1); and, 12 C.F.R. § 1024.41(e)(2)(ii), by failing to provide required notices and act reasonably during the loan modification process. With regard to damages, Mrs. Necak alleges she suffered severe emotional distress; was prevented from obtaining a loan modification; and, was forced to incur the costs and attorneys' fees in defending the Foreclosure Action filed in State Court. Mrs. Necak alleges SPS is liable to her for statutory damages in excess of $2,000.00, actual damages for each of SPS's violations of RESPA; and, attorney fees and costs pursuant to 12 U.S.C. § 2605(f).

In Count II, Mrs. Necak alleges SPS's actions constitute fraud. Specifically, Mrs. Necak alleges SPS knowingly or with reckless disregard for the truth, made numerous false and contradictory material representations on the part of SPS which made it impossible for Mrs. Necak to satisfy the Loan Modification requirements.

### III. Motions for Summary Judgment.

SPS filed its Motion for Summary Judgment (Docket #53) and Mrs. Necak filed her Motion for Partial Summary Judgment (Docket #54) on January 9, 2019. Opposition Briefs were filed on February 8, 2019. (Docket #s 56 and 57.) Reply Briefs were filed on February 22, 2019. (Docket #s 59 and 60.) The Parties' Motions before this Court are fully briefed and ripe for review.

### IV. Standard of Review.

Summary judgment is appropriate when the court is satisfied "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. Ohio 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. Mich. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. Ky. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## V.    Discussion.

### A.    RESPA.

"RESPA is a consumer protection statute that regulates the real estate settlement process." *James v. Ocwen Loan Servicing, LLC*, No. 1:17-CV-0501, 2017 U.S. Dist. LEXIS 203790, at *9 (S.D. Ohio Dec. 12, 2017), report and recommendation adopted, 2018 U.S. Dist. LEXIS 35965 (internal quotations omitted). Congress intended RESPA "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." *Id.* (quoting 12 U.S.C. § 2601(a)). "Although the 'settlement process' targeted by the statute was originally limited to the negotiation and execution of mortgage contracts, the scope of the statute's provisions was expanded in 1990 to encompass loan servicing.'" *Id.* (quoting *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013) (other quotations omitted)). "As a remedial statute, RESPA is construed broadly to effectuate its purposes." *Marais*, 736 F.3d at 719 (internal quotations omitted).

Regulation X consists of the Mortgage Servicing Rules promulgated by the Consumer Financial Protection Bureau ("CFPB") pursuant to § 1022(b) of the Dodd-Frank Act, 12 U.S.C. § 5512(b), and RESPA, 12 U.S.C. § 2601, et seq., *Cooper v. Fay Serv., LLC*, 115 F. Supp. 3d 900, 903 n.6 (S.D. Ohio 2015). Regulation X imposes certain obligations on a loan servicer with respect to loss mitigation generally and the processing of a borrower's loan modification application. *James*, 2017 U.S. Dist. LEXIS 203790, at *10 (internal citations omitted). "Whoever fails to comply with any provision of [RESPA] shall be liable to the borrower for each such failure[.]" 12 U.S.C. § 2605(f). If liability is established, "an individual may recover actual damages, and any additional damages, as the court may allow, in the case of a pattern or practice

of noncompliance with the requirements of RESPA and Regulation X, in an amount not to exceed $2,000." *James*, 2017 U.S. Dist. LEXIS 203790, at *10 (citing 12 U.S.C. § 2605(f)(1)). "An individual also may be awarded the costs of the action and reasonable attorneys' fees." *Id.* (citing 12 U.S.C. § 2605(f)(3)).

### 1. 12 C.F.R. §§ 1024.40(b)(1) and 1024.40(b)(2); Pattern or Practice.

No private cause of action exists under 12 C.F.R. § 1024.40. *See Schmidt v. Pennymac Loan Services*, 106 F. Supp. 3d 859 (E.D. Mich. 2015). Accordingly, to the extent that Mrs. Necak alleges violation of 12 C.F.R. § 1024.40, SPS is entitled to summary judgment.

Furthermore, Mrs. Necak fails to sufficiently allege a pattern or practice under RESPA.

> "The phrase 'pattern or practice' appears in many federal statutes, and 'the words reflect only their usual meaning.'" *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n.16, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). To show a pattern or practice, a plaintiff must show that noncompliance with the statute "was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* at 336; see [*Renfroe v. Nationstar Mortg.*, LLC, 822 F.3d 1241, 1247 (11th Cir. 2016)] (discussing the meaning of "pattern or practice" in RESPA)."

*Lewis v. PNC Pank, N.A.*, Case No. 3:17 CV 220, 2018 U.S. Dist. LEXIS 201997 (S.D. Ohio Nov. 29, 2018) (quoting *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 720 (8th Cir. 2018). Here, Mrs. Necak's claims result from SPS's alleged failures under RESPA with regard to a single loan mitigation application and the discrete issue of her name change. There is no evidence that the problems alleged to have occurred with respect to Mrs. Necak's loan mitigation application were the result of SPS's regular practices. Accordingly, to the extent Mrs. Necak alleges a pattern or practice under RESPA, SPS is entitled to summary judgment.

### 2. Remaining RESPA Claims under 12 C.F.R. § 1024.41.

Mrs. Necak alleges SPS violated certain provisions of RESPA by failing to send her written correspondence to notify her that both a marriage certificate and valid marriage license were required to process her name change request; by failing to notify Mrs. Necak that her loss mitigation application was complete despite being treated as such and being facially complete; by failing to promptly request all necessary information and documentation from Mrs. Necak and allow a reasonable opportunity for Mrs. Necak to meet requests for additional information after her application was facially complete; by stating that Mrs. Necak's Loan Modification was not accepted and failing to state the actual specific reasons as to why she was denied a permanent loan modification; and, by failing to provide a reasonable period of time to fulfill all requirements after she made all 3 trial payments on time.

The Official Comment to 12 C.F.R. § 1024.41 provides as follows with regard to what constitutes a loss mitigation application for purposes of RESPA:

> 2. When an inquiry or prequalification request becomes an application. A servicer is encouraged to provide borrowers with information about loss mitigation programs. **If in giving information to the borrower, the borrower expresses an interest in applying for a loss mitigation option and provides information the servicer would evaluate in connection with a loss mitigation application, the borrower's inquiry or prequalification request has become a loss mitigation application. A loss mitigation application is considered expansively and includes any "prequalification" for a loss mitigation option.** For example, if a borrower requests that a servicer determine if the borrower is "prequalified" for a loss mitigation program by evaluating the borrower against preliminary criteria to determine eligibility for a loss mitigation option, the request constitutes a loss mitigation application.

(Emphasis added.) Mrs. Necak was prequalified by SPS for a Streamline Trial Plan pursuant to HAMP in 2016; contacted and informed SPS that she was interested in the program; and, made

-13-

all three required trial payments. Mrs. Necak's prequalification constituted a loss mitigation application, thereby triggering certain provisions of RESPA that require a servicer to exercise "reasonable diligence" in reviewing an application and, if the loss mitigation application is not complete, to give the borrower a "reasonable time" within which to submit any required information.

A loss mitigation application is considered to be "complete" under Regulation X when the "servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." 12 C.F.R. § 1024.41(b)(1). When faced with an incomplete loss mitigation application, RESPA requires that the servicer exercise "reasonable diligence in obtaining documents and information to complete" the loss mitigation application. 12 C.F.R. § 1024.41(b)(1). The servicer must notify the borrower within 5 days of receiving a loss mitigation application whether it is complete or incomplete and, if incomplete, what information is needed. 12 C.F.R. § 1024.41(b)(2)(i)(B). The written notice must include a reasonable time within which the borrower can submit information to make the loss mitigation application complete. 12 C.F.R. § 1024.41(b)(2)(ii). A loss mitigation application is considered "facially complete" when a borrower submits all additional information as requested even if the servicer later discovers additional information is needed, in which case the servicer must promptly request the missing information or corrected documents and allow the borrower a reasonable opportunity to complete the application." 12 C.F.R. § 1024.41(c)(2)(iv). Furthermore, a borrower who has completed all the payments required under a trial loan modification plan, but otherwise failed to satisfy the servicer's requirements, must be given a reasonable period of time to fulfill any remaining requirements.

12 C.F.R. § 1024.41(e)(2)(ii).

Once a complete loss mitigation application has been submitted, RESPA imposes additional requirements on the servicer to review and provide notice to the borrower. 12 C.F.R. § 1024.41(c)(1), 12 C.F.R. § 1024.41(c)(3). The servicer must review the application and provide written notice to the borrower within 30 days stating its determination and, if an application is denied, the servicer must include the specific reasons for the denial. 12 C.F.R. § 1024.41(d). Finally, once a complete loss mitigation application has been filed, a servicer can only file a foreclosure action after certain criteria have been met. 12 C.F.R. § 1024.41(f).

The only thing preventing Mrs. Necak from fulfilling all of SPS's requirements was the inability to get her signature – in her married name – notarized, because it did not match the documents sent to her by SPS, which were drafted with her maiden name. The evidence is undisputed that Mrs. Necak alerted SPS of the problem prior to the application deadline and made numerous attempts to resolve the signature issue – contacting SPS by phone repeatedly and sending information as it was requested – but was given information, directives, deadlines and reassurances by various SPS representatives which she relied upon and which were, at best, inconsistent.

As set forth above, RESPA's notice and review requirements are triggered both when the servicer receives an application that it deems to be incomplete, as well as once a complete, or facially complete, application is received, and SPS is required to act reasonably during the review process. Furthermore, under 12 C.F.R. § 1024.41(e)(2)(ii), a borrower who has completed all the payments required under a trial loan modification plan, as Mrs. Necak had, but has otherwise failed to satisfy the servicer's requirements, must be given a reasonable period of

time to fulfill any remaining requirements. The RESPA provisions relevant in this case obligate the servicer to exercise reasonable diligence in reviewing loan applications; promptly request additional information from the borrower as needed and allow a reasonable time for the borrower to respond; and, consistent with those requirements, provide certain written notices to the borrower throughout the process. Whether SPS acted reasonably under the facts and circumstances of this case presents a question of fact which must be resolved by a jury, along with the question of damages. Accordingly, to the extent SPS seeks summary judgment as to Mrs. Necak's remaining RESPA claims, SPS's Motion for Summary Judgment is denied.

**B.     Fraud.**

Under Ohio law, a claim for fraud requires: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance. *Terlesky v. Fifth Dimension, Inc.*, Case No. 15 CV 374, 2015 U.S. Dist. LEXIS 155236, at *16-17 (S.D. Ohio Nov. 17, 2015)(citing *Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827, 834 (S.D. Ohio 2003)).

There is no evidence that any of alleged representations or misrepresentations made by SPS in this case were made with the intent of misleading Mrs. Necak. Accordingly, SPS is entitled to summary judgment on Mrs. Necak's claim for fraud.

## VI. Conclusion.

The Motion for Summary Judgment filed by Defendant, Select Portfolio Servicing, Inc. (Docket #53) is GRANTED IN PART AND DENIED IN PART, and the Motion for Partial Summary Judgment filed by Plaintiff, Tracey A. Necak (Docket #54) is hereby DENIED.

IT IS SO ORDERED.

_____
DONALD C. NUGENT
Senior United States District Judge

DATED: April 26, 2019